## No. 10,778.

### SUCCESSION OF MISS AGLAÉ ARMANT.

1. The olographic, like every other testament, is a solemn act depending for its validity upon compliance with the forms prescribed by law; and however clearly it appear that the decedent intended the instrument to be her will, if it is not clothed with the forms prescribed, it can not stand.

2. An olographic testamentary writing containing the caption "Testament d'Aglaé Armant," but without signature at the end or following the testamentary dispositions, does not import such a signature as is required under the historical and rational interpretation of the Article 1588 of our Code.

3. The Article 1588 was copied into our Code from Art. 970 of the French Code, which in turn had been taken from an ordinance of Louis XV, prescribing the forms of the olographic testament. Prior and subsequent to the Code Napoleon the jurisprudence of France has been uniform to the effect that the signature must be at the end of the testament or at least that no dispositions following the signature can have effect.

4. This jurisprudence was extant and well known when the framers of our Code adopted our article. It must be presumed that they intended it to receive the same interpretation which, moreover, correspond to the common understanding and to the standard definition of the meaning of the word *signature.*

5. A contrary interpretation of a like provision in the English statute of Frauds by certain English and American courts, was so much criticised by sound legists that the statute was amended so as to expressly require the signature to be at the bottom of the testament.

6. We are moreover satisfied in this case that the name, as written in the caption, was not intended to be a signature but that her belief that the instrument was her will was simply based on her ignorance that a signature was necessary.

7. The other ground assumed in support of the instrument as a will is inconsistent with the foregoing and is besides unsupported by proof.

A PPEAL from the District Court for the Parish of St. James.
Duffel, J.

### T. J. Semmes & Legendre for Appellant:

The signature of the testator to an olographic will need not be at the foot of it; it may be at the top, or in the body of the instrument. Lemoyne vs. Stanley, 3 Leving; Wright vs. Wright, 7 Bing. R. 457; White vs. Trustees British Museum, 6 Bing. 316; Sarah Mill's case, 4 Dana, 1; Elizabeth Selden vs. J. Coalter, 21st Vert, 264; Adams vs. Field, executor, 2 Va. Cases, 553; Dalloz, No. 2729; Pasicrisie, 1863, 2, 333.

The order of formalities prescribed in article 1588 of the Code is sacramental. 2 An 273, Succession of Mrs. Fuqua.

The same rule applies to commercial paper. It is not necessary that the signature of the maker of a note or drawer of a draft be at the bottom of it. It may be in any part of the paper, at the top as well as at the bottom. Randolph, Sec. 65; Byles on Bills, Sec. 87; Bayley on Bills, Sec. 11.

### Sims & Poché, for Appellee:

1. The paper writing offered for probate as the last will of the deceased is a nullity. It was never signed by her. The other paper writing styled a "codicil" is likewise a nullity. The witnesses thereto are all women and none of the formalities required by law for nuncupative wills under private signature were complied with. C. C. Arts. 1570, 1581, 1582, 1591.

2. The formalities prescribed by law for the execution of testaments are sacramental; they must be observed strictly on pain of nullity. C. C. Arts. 1595; 31 An. 318.

3. The testimony of the three witnesses with reference to verbal statements made by the deceased concerning her final dispositions was clearly inadmissible. Wills or testaments can not be made by parole. C. C. Art. 1576. The objections set forth in the bills of exceptions to the judge's ruling admitting that testimony are again urged.

4. The pretension that the deceased had signed the alleged will, but that her signature was subsequently cut off, is not supported by a single fact in the record. All the letters and receipts of deceased in evidence and which we have attached, by consent, since the case was submitted show that deceased did not always write her name with an accent over the letter "e," and sometimes she did not even write her first name in full, but signed herself thus: "A. Armant." An examination of those letters and receipts will demonstrate that wherever an accent occurs over the letter "e" in Aglaé, it would have been a physical impossibility to cut off the signature without also destroying all trace of the accent. In a number of instances there is no accent over the "e," and this is notably the case with respect to the name of the deceased as it appears at the top of the first page of the alleged will.

5. Even if there were evidence to create even a suspicion that the signature had been cut off, the presumption would be that the deceased mutilated it *animo revocandi*. 35 An. 402.

The opinion ot the court was delivered by

FENNER, J. "Testament d'Aglae Armant." Such is the caption appearing at the beginning of an olographic writing containing testamentary depositions and offered for probate as a will, but without any signature at the end; and the question is, does this caption import such a signature as is required to an olographic testament? Before the adoption of the Napoleon Code an ordinance of Louis XV provided that olographic testaments should be "entirely written, dated and signed in the handwriting of him or her making them."

Under this provision the jurisprudence of France required, in the language of Pothier, that "la signature doit être à la fin de l'acte, parcequ'elle en est le complément et la perfection; c'est pourquoi un *post scriptum* après signature est nul, s'il n'est pas aussi signé." Poth. Don. and Test., Chap. I, Art. 2, Sec. 2. Thus interpreted, the same provision passed into the Napoleon Code. The commentators on the Code and the French tribunals have uniformly adopted the same interpretation. The only exception made (and that by a divided opinion) is that the *date* may follow signature, and that words written after the signature which are superfluous may be disregarded. Thus in the case of Veuve Guyot, the will ended thus: "Fait par moi Pauline d'Espinose, Veuve Guyot, qui ai signé après la lecture et méditation." The court maintained the will on the ground that the name was intended as a signature, and that "the two lines which follow the signature can have no influence on the form of the testament, which was perfect when they were written." Jour. du Palais, 20 Apr. 1812. It is useless to cite the French commenta-

tors; they all agree that testamentary dispositions following the signature are invalid.

The following is a summary of the French doctrine and authorities as given by an annotator of the Code: "Although the natural place of the signature be at the end of the act, because it expresses the final approval given by the testator to the dispositions of last will which he has made, it is, however, admitted that the writing by the testator of his name toward the end of the act may be considered as a signature if it is placed after all the dispositions constituting the testament. It does not matter that after the name there may follow some words connected with it, if the words thus following are superfluous or useless," quoting: Cassation, 20 April 1813; Merlin Rep. Verbo Signature, Sec. 3, Art. 7; Toullier on Art. 970 Fr. Code; Marcadé on Art. 970 Fr. Code; 4 Demante No. 115; 4 Massé and Vergé, p. 96, Sec. 438; 7 Aubry and Rau, p. 108, Sec. 668; Vazeille on Art. 970, No. 4; 2 Grenier and Bayle, No. 228; 4 St. Espes-Lescot, No. 1010; 21 Demolombe, No. 114; Coin Delisle, Art. 970, No. 42; 3 Troplong, No. 1494; 13 Laurent, No. 227. See also Cross on Successions, who takes the same view.

Marcadé, who is as liberal as any, in commenting on a testament ending thus: "Fait et signé par moi Michel Francois, Falla, le 20 Dec., 1809," says: "The question must be determined according to the circumstances of fact. If the names are accompanied with the ordinary paraph of the party; if, having no paraph, the party has taken care to write the name in more pronounced character than the rest of the writing; if the name, though written in like character, is that of a party whose acts generally have been signed in ordinary writing and by placing the name in the body of the concluding phrase, one might say that it was a signature, and that the testament was valid. But if, on the contrary, the name thus written was without a paraph and in no manner distinguished from the rest of the writing, and comes from a party who has always attached to his acts an independent signature, one would say this was not a signature." 4 Marc. p. 10. Applying these tests, we find that the name of this testatrix is written without a paraph, though the evidence shows that she usually, but not universally, employed one; that the name is written without any distinctive characteristics, and that, as appears from every document produced, she invariably attached an independent signature at the end. Moreover, it seems to us that

the coupling of the " d " with the name, in itself excludes the idea of its being intended as a signature.

Thus, under French jurisprudence, this will would fail to stand for two reasons: (1) because the writing of the name was not *intended* as a signature; (2) because, whether so intended, or not, the signature was not at the end of the act.

This jurisprudence was extant and well established when, in 1825, the article of the French code was copied into our own. We think it to be a fair presumption that the framers of our Code, familiar with the interpretation of the same language, both prior to and subsequent to the Napoleon code, must have intended and expected that our own article should receive the same interpretation, particularly as it conforms to the common and customary meaning attached to the word *signature*, as well as to the definitions thereof in all standard dictionaries.

Why should we depart from it?

It is true that in interpretating a like provision of the first English statute of Frauds, an English court held that writing the name at the beginning of the testament supplied the absence of signature at the end; and some other courts, with that subjection to precedent which characterizes that system, followed the decision. But though following it, some of the judges intimated that if it were *resnova* they would decide differently, and the doctrine was condemned by sound legists. Dr. Brown in his work on Civil Law, and Dr. Christian in his edition of Blackstone, criticise it severely. Browne's Civ. L., p. 278, Note 16.

And such was the prevalent dissatisfaction that an act of Parliament was passed to amend the statute so as expressly to require the signature to be *at the bottom* of the testament.

We were at first much impressed with the clear proof made that the deceased *intended* this paper to be her testament. But there is no more doubt that she *intended* the invalid nuncupative codicil to be her testament. Yet, as the latter was attested by women who are incompetent testamentary witnesses, no one claims its validity. And so if the olographic will is not signed as required by law, her intentions can not save it.

The question is not whether she *intended* this paper to be her will but whether it *is* a will clothed with the forms of law. An olographic, like every other testament, is a *solemn act*. It matters not how

clearly it conveys the last wishes of the decedent, if it is not clothed with the forms prescribed, it is null.

Even apart from the name's not being at the end of the testament we think the proof does not·show that she intended to sign at all. It simply shows that she did not think or know that a signature was essential. If she had known that it was necessary that the testament should be *signed*, it is impossible to conceive how, in so important a matter, she should have acted so ambiguously and so differently from the course universally pursued by her in signing other acts and documents of every description. The simple fact is she did not know a signature was necessary and therefore did not sign. Her mistake in this respect is unfortunate in the interests of justice, but it can not save the will.

The remaining contention of appellant, that·the testatrix had signed the will at the end of the act and that her signature had been cut off by some third person, is so inconsistent with the one just disposed of that it hardly lies in the mouth of appellant to urge them both. But, moreover, it is unsupported by proof and has nothing . to rest on.

Judgment affirmed.